UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Matthew J. Kidd, Esq. (mk6513)
Law Offices of Matthew J. Kidd
12 Ericsson Street, Suite 201,
Boston, MA 02122
Tel 617-820-8400

Michael S. Kimm, Esq. (*Pro hac vice* pending)
KIMM LAW FIRM
333 Sylvan Avenue, Suite 106
Englewood Cliffs, NJ 07632
Tel 917-477-8500

*Attorneys for Plaintiff*

| | |
|---|---|
| JEONG HOON KIM,<br><br>                    Plaintiff,<br><br>        vs.<br><br>TRUSTEES OF BOSTON UNIVERSITY aka B.U. SCHOOL OF DENTISTRY aka B.U. GRADUATE SCHOOL OF DENTISTRY, DOLRUDEE PORSCHE JUMLONGRAS, JEFFREY HUTTER, SUSAN LO, SHABTAI SAPIR, WENDY CHENEY, CATALDO LEONE, and JANE DOES & JOHN DOES 1 THROUGH 10,<br><br>                    Defendants. | Civil Action<br><br><br><br><br><br>**Complaint with Jury Demand** |

**PRELIMINARY STATEMENT**

Plaintiff brings this action against the above-named defendants, and states upon

knowledge, except where stated upon information or belief, as follows:

1. Plaintiff has been a successful, practicing dentist in his country of birth, where the

standards of dentistry are generally at par or superior to modern dentistry standards in the

1

United States.

2. In approximately 2007, plaintiff relocated to the United States and sought to establish a dental practice in the United States. In 2016 plaintiff enrolled at Boston University Henry M. Goldman Graduate School of Dentistry to pursue a U.S.-based graduate degree to expand his dental practice to the United States. When he applied for enrollment in the B.U. Graduate School of Dentistry in 2016, for a three-year dual masters and post-doctoral degrees, plaintiff was already highly experienced in the "art and science" of modern dentistry.

3. Plaintiff applied to, and enrolled in, the Graduate School of Dentistry's program called "Certificate in Advanced Graduate Studies" (CAGS). Having graduated from the first year's master's program, as plaintiff's graduate study progressed to the post-doctoral phase, plaintiff encountered heavy political pressure and political-correctness that were used by defendants to color his "academic abilities" out of the academic context, and into the realm of subjective, political backlash. In 2019-2020, based upon defendants' perception that plaintiff was a "bad person" and an "[Asian] male chauvinist," defendants formed a "Star Chamber" type of association, not formally countenanced by Boston University but whose actions were ratified by it, and entered into an undisclosed "pact" among themselves to prevent plaintiff from graduating so as to prevent him from being rewarded for his "politically-unacceptable behavior."

4. Plaintiff had no idea that the defendants had formed and operated a "Star Chamber" type of organization against him until one of the insiders disclosed the facts to his attorneys

in 2021.  This action seeks vindication for defendants' wrongful treatment of plaintiff as a student merely because they held the power they could wield and they disapproved of plaintiff's behavior unrelated to academic performance, based upon plaintiff's status as a Korean male, whom defendants labeled, "Korean male chauvinist."

## THE PARTIES

5. Plaintiff is a natural person who currently resides out of state.  In 2016 through 2021, plaintiff resided in Boston and attended the BU Graduate School of Dentistry.

6. Defendant Boston University aka "B.U. School of Dentistry" aka "B.U. Henry M. Goldman School of Dental Medicine" (School; School of Dentistry) is an educational institution with its principal address at 635 Albany Street, Boston, MA 02118.  Defendant School is believed to be "private" but receives funding from the United States government and thus is subject to certain laws relating to due process and fairness, particularly under Title IX of the United States Code.

7. Defendant Wendy Cheney is believed to be Program Director and Clinical Professor in Department of Pediatric Dentistry, Boston University Graduate School of Dentistry, with an address at 1 Silber Way, Boston, Massachusetts, 02215.  This defendant committed acts and omissions in her capacity as a program supervisor and/or an officer of B.U. Graduate School of Dentistry and also engaged in acts and omissions ultra vires to her official role, by engaging in "backroom subterfuge" to remove a student based upon contrived pretext.

8. Defendant Susan Lo is a former Clinical Assistant Professor of Dentistry and is

apparently no longer associated with B.U. School of Dentistry. This defendant is believed to maintain an address at 10 Grove Street East, Boston MA 02128. This defendant committed acts and omissions in her capacity as a program supervisor and/or an officer of B.U. Graduate School of Dentistry and also engaged in acts and omissions ultra vires to her official role, by engaging in "backroom subterfuge" to remove a student based upon contrived pretext.

9. Defendant Cataldo Leone is currently Dean of the B.U. Graduate School of Dentistry and maintains a business address at 635 Albany Street, Boston, MA 02118. At all relevant times, defendant Cataldo Leone was Associate Dean for Academic Affairs, who had administrative supervision over the CAGS program at B.U. Graduate School of Dentistry. This defendant committed acts and omissions in his capacity as an officer of B.U. Graduate School of Dentistry and also engaged in acts and omissions ultra vires to his official role, by engaging in "backroom subterfuge" to remove a student based upon contrived pretext.

10. Defendant Jeffrey Hutter is former Dean and is now Dean Emeritus of the B.U. School of Dentistry whose address is unknown to plaintiff. However, plaintiff believes that this defendant is amenable to service of process at the B.U. School of Dentistry at 635 Albany Street, Boston, MA 02118, as his name and identity are still listed on the "Faculty" listing page of its website, as well as being "Dean, emeritus." This defendant committed acts and omissions in his capacity as an officer of B.U. Graduate School of Dentistry and also engaged in acts and omissions ultra vires to his official role, by engaging in "backroom subterfuge" to remove a student based upon contrived pretext.

11.  Defendant Shabtai Sapir is believed to maintain an address at 65 Holbrook St Ste 210, Norfolk, MA, 02056.  This defendant committed acts and omissions in his capacity as an officer of B.U. Graduate School of Dentistry and also engaged in acts and omissions ultra vires to his official role, by engaging in "backroom subterfuge" to remove a student based upon contrived pretext.

12.  Defendant Dolrudee Porsche Jumlongras is an Associate Clinical Professor of Dentistry and was at all relevant times the Interim Program Director for the post-graduate dentistry program in which plaintiff enrolled.  This defendant maintains an office address within the B.U. School of Dentistry at 635 Albany Street, Boston, MA 02118.  This defendant committed acts and omissions in her capacity as a program supervisor and/or an officer of B.U. Graduate School of Dentistry and also engaged in acts and omissions ultra vires to her official role, by engaging in "backroom subterfuge" to remove a student based upon contrived pretext.

13.  Defendants Jane Doe or John Doe 1 through 10 are potential defendants whose true identities are presently unknown to plaintiff, and who may be joined in this action at a later time when their identities become developed in discovery.

## JURISDICTION AND VENUE

14.  The Court has subject-matter jurisdiction over this action under 28 U.S.C. §1331 in that the action implicates federal question.

15. In addition, the Court also has jurisdiction under 28 U.S.C. § 1332(a) in that the dispute involves an amount in controversy in excess of $75,000 exclusive of costs and

interest and plaintiff is a citizens and domiciliary of New Jersey and all defendants are domiciliaries of other states.  The Court has supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367.

16.  Venue is proper in this district because the essential events, including defendants' ongoing conspiracy to violate plaintiff's rights, have occurred in this district.

## COMMON ALLEGATIONS

### 1. Plaintiff's Successful Dental Practice

17. Defendants' scheme to violate plaintiff's rights began approximately in 2019 and continued through 2021 and is currently active.  Plaintiff is a dentist licensed overseas since 1992.  He received his degree in doctor of dentistry in 1992.  He had been engaged in active practice and had been the principal of numerous dental practices throughout his home county, until his relocation to the United States before enrolling in Boston University.  At the height of his practice, plaintiff had built a network of dental practices and/or support companies throughout his native county under his managerial, operational, and/or ownership purview.

18. In late 2007, plaintiff relocated to the United States to expand his practice of dentistry and began to take steps to build a new practice base, within the United States, that would extend his involvement in the field of dentistry.

19. Plaintiff explored various schools of dentistry in the United States, for potential enrollment, and came to learn that Boston University was seeking candidates for its master's program in Pediatric Dentistry at B.U. Graduate School of Dentistry.  The post-doctoral masters degree program consisted of certain credit hours of courses plus research.  The

department of pediatric dentistry also offered a clinical certificate program that consisted of additional courses plus a clinical practice component in Pediatric Dentistry.   At the time of application, plaintiff came to learn that approximately a dozen residents are selected to the post-doctoral program each year.

2. 2016, Plaintiff's Enrollment in the Graduate

School of Dentistry, CAGS Program

20. In late 2015 Plaintiff applied and was accepted to the one-year Masters of Science in Dentistry degree program, which he completed in 2017. In late 2016, Plaintiff applied for the two-year CAGS program and he was admitted with a start date of July 1st 2017.

21. Plaintiff was among 13 new students matriculated into the Graduate Dental School; but was the only one placed into the MSD program.   Among the other 12 students enrolled at the same time, upon information and belief, 11 were matriculated in the 24-month Certificate of Advanced Graduate Study (CAGS) in Pediatric Dentistry and one was matriculated in a joint  CAGS / Doctorate of Science in Dentistry (DScD) program.

22. In May 2017, having completed the Masters program, Plaintiff continued with his post-doctoral program of a 36-month combined MSD and CAGS program in Pediatric Dentistry.  Although he was prepared to start immediately, the Graduate School of Dentistry placed his course work on hold, from approximately May 17, 2017 to late July 2017, for approximately two full months, pending a criminal background check result.  Eventually, the hold continued for four more months, and Plaintiff's CAGS program did not commence until January 2018, delayed by six months.

3. <u>2017, Defendants' Pretextual Suspension</u>

23. Plaintiff had been subject to a criminal background check in 2016, at the time of his initial application into the MSD program, which revealed no result. But the 2017 criminal background check resulted in the School of Dentistry's knowledge that, on April 1, 2017, Plaintiff became the focus of an allegation under Massachusetts General Law, Chapter 265, Section 13A, for simple assault and battery, pending in Boston Municipal Court. The Graduate School of Dentistry informed Plaintiff as to its investigative finding and requested an explanation. Plaintiff provided an explanation both verbally and in writing.

24. Following Plaintiff's explanation and disclosure, the School of Dentistry apparently dropped the matter. There was no hearing or charge or allegation of "unfitness" to be an enrolled student of the School of Dentistry. The Graduate School of Dentistry did not bring any student disciplinary charge or even suggest that one was might be pursued based upon the event external to Plaintiff's academic performance in the Graduate School of Dentistry. Neither the Chairman of the program in which Plaintiff had been admitted nor anyone in upper management of the Graduate School of Dentistry, including the Dean of School, or Associate Dean, expressed any concern with the fact that Plaintiff had been charged with an act of simple assault.

25. Under the School's policies, a student facing a minor, disorderly-persons level, municipal court charge, for "simple assault," which was not an alleged "crime," was not a proper subject of any action by the School. Even where an individual is ultimately found "guity" of such a violation, even though it would certainly be regrettable and constitute a

personal low point, it would never be deemed to be so egregious as to warrant suspension or expulsion from an institution of higher learning, particularly one that has been receiving billions of dollars of federal funds. So a pending allegation simply would not support suspension or expulsion of any student, even among those at the youngest age groups, college students, who are more prone to misconduct than those at graduate studies.

26. During the six-month period from approximately July 2017 through January 2018, defendants knew that Plaintiff was fully qualified to begin the second stage of his studies, pending "clearance" from the Massachusetts Board of Registration in Dentistry (BORID); BORID had placed restrictions (not issuing a limited license) to Plaintiff's ability to start the clinical portion of his CAGS program based on at-the-time pending litigation.

27. Despite the legal and School policy standards, the named-defendants agreed, conspired, schemed and actually took substantial steps to complete the object of their conspiracy, to preclude Plaintiff from advancing in his studies. Among themselves, upon information and belief, they deemed his very enrollment in B.U. as "hot" and "undesirable" and they formed a silent pact to use the municipal court charge to remove Plaintiff, and they first used the opportunity presented in their "criminal background search" of 2017 to delay his continuation of studies so as to expel him from the School. For defendants, the plaintiff as a "Korean, male chauvinist," who "does not belong here."

28. The named-defendants agreed to this objective by forming an unlawful, unconstitutional, "Star Chamber" among themselves, to dispense their sense of justice against Plaintiff.

29. In January 2018, the "simple assault" charge pending in Boston Municipal Court was dismissed without any finding by the that court. Plaintiff and his then-attorneys provided the School with the court disposition record, which was also part of the public record at the time. This action of court disposition lifted the restrictions of BORID and resulted in BORID's issuing the required limited student license to initiate the clinical portion of the CAGS program. When the named-defendants learned of this result, rather than moving on with their official roles, these defendants discussed, agreed, and took substantial steps to actualize their secret agreement that "[Plaintiff] had to go."

30. Plaintiff's official status as a "student" at the School was never impaired at any time even during the pendency of the "simple assault" charge. Plaintiff was listed as "enrolled," with no interruption at any time, for any reason. Plaintiff's student transcript is totally devoid of any negative comment either relating to the "simple assault" charge or his status as a graduate student. There are no records or notations anywhere, except among defendants' internal, secret communications that Plaintiff had been prevented, delayed and was the target of defendants' scheme to "let him go," based upon their own unlawful decision.

31. At the forefront of the unlawful acts against Plaintiff was defendant Cheney. In addition to serving as BU Program Director, Cheney was the Clinical Director of the Pediatric Dental Clinic at Franciscan Children's Hospital, which operated a clinic under a joint auspices with the School. Defendant Cheney disdained Plaintiff so much, without an educational or clinical basis, that she harassed him routinely, and coerced Plaintiff to use his

"free time" to clean the Franciscan Hospital facilities, despite the existence of custodians and janitors, and other staff, for such purposes. She targeted Plaintiff as a "Korean, male chauvinist," to be expelled and reached out to the other named-defendants beginning approximately in January 2018.

32. Upon information and belief, she conferred with defendant Susan Lo in secret; they conferred with defendant Cataldo Leone in secret; and they conferred with defendants Porsche and Hutter in secret meetings and communications. Eventually, defendant Jumlongras accidentally disclosed to Plaintiff that he was being "seen poorly" because he was seen as a "Korean, male chauvinist [pig]," whose actions "might hurt B.U."

33. Defendant Cheney's abuse of Plaintiff became so notable that ultimately, Jeffrey Hutter, as the Dean of the School requested his "reassignment" of Plaintiff from the Franciscan Children's School to the School's own facilities to complete Plaintiff's clinical practice component.

34. That, however, did not resolve the matter. Upon information and belief, defendant Susan Lo, a faculty member within the School and Clinical Director of the East Boston Community Health Center, continued to confer with other named-defendants and decided to use this opportunity to cause Plaintiff's expulsion from the EBCHC dental clinic, without any educational ground or due process. This action of severe discipline without due process constitutes a violation of Plaintiff's right as student at BUGSDM. As evidence will show, Defendant Lo met with the CAGS Program Chairman Dr. Athanasios Zavras, and justified her view that Plaintiff must be removed from the Program in which he had already completed

half of the three year course.  The "reason" for the removal was, still, that Plaintiff in her view was a "Korean male chauvinist" who must not be permitted to hold a B.U. diploma. Since no student could be expelled based upon a personal grudge like this, defendants concocted a bunch of "reasons" and schemed to tell Plaintiff that he was essentially at sub-par performance and in need of "remediation."Defendant Lo spoke with defendant Porsche and Cheney on multiple occasions, and initially defendant Porsche rebuffed defendant Lo's scheme to cause Plaintiff's expulsion from EBCHC.  In time, however, defendants Leone and Sapir became involved and they supported defendants' Cheney and Lo's view that Plaintiff "had to go" not only from the EBCHC but from BUGSDM as well. Upon information and belief, these defendants discussed their views with defendant Hutter, who was Dean of the Graduate School of Dentistry at the time, and defendant Hutter, being a highly experienced administrator for many years, "pressed the buttons" unofficially by directing defendant Leone, as then-Associate Dean and Chair o the Advanced Education Committee, to create the grounds to expel Plaintiff.

35.  Although defendant Dolrudee Porsche Jumlongras initially opposed such harsh action against Plaintiff, when in late 2019 defendant Hutter and Leone got involved and directed the signals, she understood that it was her role, as Program Director, to create the subterfuge to "let him go," in conjunction with defendant Sapir.

### 4. 2018, Defendants' Scheme to Expel Plaintiff

36. One of the requirements of the 36-month combined MSD and CAGS program in Pediatric Dentistry was to engage in certain aspects of clinical practice.  This, in turn,

required a "temporary license" to practice dentistry under the Graduate School of Dentistry's setting, under supervision, in a hospital setting.

37. The subject of the temporary license, too, was a topic of internal debate and consternation among defendants. Some defendants wanted to delay it until Plaintiff would lose interest in continuing his studies.

38. Plaintiff practiced pediatric dentistry in that setting, under the Program Director's supervision, for the next two calendar years, uneventfully. As his three-year post-doctoral graduate studies wound down, Plaintiff expected to give a clinical presentation in his field of study, pediatric dentistry.

5. 2019-2020, Doctoral Review Committee's

Recognition of Plaintiff's Competency

39. From approximately January 23, 2019 to February 25, 2020, and continuing through at least May 5, 2020, the defendants Porsche Jumlongras, Cataldo Leoneand Jeffrey Hutter, among themselves, and in concert and participation with others, conspired and schemed to blacklist plaintiff Plaintiff, in spite of the now-dismissed municipal court assault charge, and to sabotage his graduation from the B.U. Graduate School of Dentistry based upon their continued, political-correctness view that Plaintiff was a "bad person" and a "male chauvinist."

40. From approximately January 23, 2019, through at least May 5, 2020, defendants agreed, conspired, schemed and actually took substantial steps to complete the object of their conspiracy to kill any chance of Plaintiff's graduation from the Program by falsely rendering

his clinical practice ability as "incomplete." In furtherance of their scheme and conspiracy, the named defendants took the following additional steps:

41. On or about January 23, 2019, defendant Cheney, openly stated, in sum and substance, "[plaintiff] must not be permitted to graduate from 'our school'," and circulated emails and other communications and engaged in off-the-grid back-channel innuendo with the other named-defendants and others.

42. On or about January 23, 2019, after defendant Susan Lo circulated her email, defendants Porsche and Lo were gearing up to deny Plaintiff's temporary license so as to cause him to be "unable" to complete the Program. They communicated with Dr. Zavras, the Program Chairperson, about his views and Dr. Zavras made his views clear that the School was bordering on violating Plaintiff's and legal rights as a student. In an email dated January 23, 2019, Program Chair Dr. Zavras told Dr. Porsche:

> Not sure what the outcome will be with Dr [Doe]. We have to wait for the School to let us know.
>
> For now we need to make sure we sign his limited license application so we do not violate his rights as a student. I just signed for his BU and his Franciscan sites. I will sent him to you to sign for EBNHC.

43. Defendants Cheney, Porsche and Lo did not heed Dr. Zavras' view that Plaintiff's rights should be respected and that he should be permitted to move forward with the completion of his education. Defendants Cheney, Porsche and Lo, began to take steps to influence defendant Dean Hutter to stymie Plaintiff from the CAGS program and to expel Plaintiff, having failed to achieve their goal previously.

44. On or about June 5, 2019, based upon certain alleged "deficiencies," mostly

involving technical matters, defendants Cheney and Porsche informed Plaintiff that he was being placed on potential "probationary status" and sent him an email stating that he needed to complete a "remediation" program in seven areas. Again, upon information and belief, defendants intended to use this probationary status to expel him. They assumed that Plaintiff would resist, and they intended to elevate the "probationary warning" to "expulsion." Had Plaintiff refused to satisfy the alleged "deficiencies," defendants would have moved to expel him at their next opportunity.

45. The seven alleged deficiencies were manufactured by defendants Cheney and Porsche, with the support and assistance of other defendants. The alleged deficiencies were mainly of technical nature, but a key aspect of the alleged "deficiencies" related to Plaintiff's "English ability" based upon defendants' racist views about his "rough accent."

46. Many CAGS candidates and instructors and professors, even among the B.U. community, to say nothing of the university composition of foreign students, were of foreign origin, from places such as China, India, the Middle East, and other parts of the world whose "accent" could easily be characterized as "hard." Certainly Koreans are not uniquely possessed of a "hard" accent. Yet, in furtherance of their objective of weeding out Plaintiff from the Program due to their political bias against him for being a "Korean male chauvinist," those in power over Plaintiff's curriculum told him that his "accent" was unacceptable; that he had to "improve upon" his "strong Korean accent" before he could advance. Defendants placed an unreasonable stigma upon a single candidate they personally disdained for reasons unrelated to academic standards. It was full blown racism practiced

at the highest levels of the academia.

47. As Interim Director of the Graduate CAGS Program in 2019, defendant "Dr. Porsche" was competing with another Assistant Professor of Clinical Dentistry, Dr. Shabtai Sapir, to become the next Program Director.

48. While they competed for the same position, in relation to Plaintiff, Porsche and Sapir were, upon information and belief, in agreement, along with Cheney and Lo, to prevent Plaintiff's completion of the Program. In Fall 2019, defendant Sapir, himself a naturalized US citizen born in the former Soviet Republic of Georgia and previously residing in Israel, with an "accent," attacked Plaintiff's "English ability," in the context of a pediatric patient who was believed to be autistic and not easily amenable to normal communication. While Sapir was predisposed and quick to criticize, he failed to perceive that it was the patient's own medical condition which rendered the communication "difficult." Sapir exacerbated the "[Asian] male chauvinist" view with his colleagues, and these defendants, with the express approval of Dean Hutter, and his subordinate, at the time Assistant Dean and currently Dean of BUGSDM Leone, piled on these "seven deficiencies," including the "hard" Korean accent, to stymie plaintiff.

49. Defendant Sapir had been assigned to instruct Plaintiff regarding sedation practice. The Program required 24 cases (patients) of sedation administration be completed by each graduate student in the Program, and Plaintiff had completed 18 patients, and 6 more were required, but the Franciscan Children Hospital where the clinical practice was being performed had "run out of patients." Defendant Sapir was highly selective if and what cases

to assign to each student resident and solely had the grading authority; based on his preconceived plan to force Plaintiff out of the program Sapir made open accusations and threats to Plaintiff in the presence of his co-residents and tried to alleniate him from his co-residents. It is believed that Sapir used the scarcity of sedation patients to make the case that Plaintiff, a graduating student at the time, is unfairly assigned cases that "belonged" to them (co-residents), creating an environment unsuitable for learning.

50. Due to this fact, defendant Sapir routinely ordered Plaintiff to perform remedial, non-professional, non-academic tasks, such as to "clean up the patient rooms"; "organize supplies"; and the like, and Sapir was so unprofessional and deliberately obnoxious to Plaintiff, a member of the Graduate School of Dentistry's student group, that Plaintiff was compelled to request of the Program Director and Chairperson reassignment to a different clinical instructor.  Eventually, both leaders agreed and reassigned Plaintiff's clinical sedation course to be completed within the B.U. setting.

51. In retaliation for Plaintiff being reassigned out of his purview, in Fall 2019, defendant Sapir told one or more of the other defendants that he, Sapir, perceived plaintiff's relationship with the Chairperson of the Program to be "unethical and improper" and that he would report it to the school's newspaper.  Upon information and belief, Sapir, is believed to have carried out his threat by "reporting" the "relationship" to defendant Dean Hutter and personally or via a student co-resident, to the school's newspaper.  Plaintiff believes that the latter did not see a story worthy of print.

52. Based upon their personal feelings, upon information and belief, defendant Sapir

and others were vocal in seeking to force plaintiff out of the Program and were behind the negative reviews of plaintiff's competency as a practitioner, which resulted in the January 2019 negative communication from defendant Dr. Porsche, who joined with them. Thus, the January 2019 "probationary" email was not a single person's effort but that of the group including defendant Dean Hutter.

53. Plaintiff always accepted as constructive criticisms, and, in January 2019, he accepted the "remediation" recommendation in the vein of constructive criticism, having no inkling that those were the foundations for defendants' ousting him from the Program, based upon their improper, ulterior motivations, and he continued to strive towards his objective and worked hard to address the "remediation" points.

54. During February through July 2019, Plaintiff doubled his efforts, worked on his English language accent even more. He had explained to the School officers that his Korean accent was not an easy matter and everyone knew that it is always a struggle for an adult to shed his or her foreign "accent" and become "Americanized" in English pronunciation. Plaintiff continued to excel through these months, and even Dr. Porsche came to acknowledge Plaintiff's efforts, when she communicated on her own and not as part of the group of cohorts scheming to expel plaintiff.

55. By June 5, 2019, by defendant Dr. Porsche Jumlongras' own measure, Plaintiff had satisfactorily completed at least 6 of the 7 areas, and this fact was confirmed in two in-person meetings, one week apart, with Plaintiff, and in her confirmation email dated June 5, 2019:

From: Jumlongras, Dolrudee <dpj@bu.edu>
Sent: Wednesday, June 5, 2019 11:19:52 PM

To: Kim, Jeonghoon <kenkim@bu.edu>
Subject: Meeting Recaps

Hi Ken,

It was great to see you last Wednesday and today. Thank you for stopping by my office for a quick catch up.

The followings are items from the meetings that I would like to recap.

     1. Remediation Plan

You have met 6 out of the 7 requirements outlined in the plan. The only item left is Case Presentations (2 cases). Once you present the cases and receive a pass grade (at least C), you will be considered remediated and will be able to participate in clinical rotation at Franciscan during the next two quarters. Mike will reach out to you to schedule a date for the presentations in the coming week.

     2. Time off in July 2019

Since you have completed and passed the Fundamentals of Pediatric Dentistry course in July 2017, you will be able to have to me off in July 2019 and begin your next clinical rotation at Franciscan in August 2019.

     3. Peds Med and BMC rotations

Your grades from Peds Med rotation, clinical rotation at BMC are still pending. I do not anticipate any issues with these 2 rotations.

     4. BU rotation, Mock Board Exams, In-Service Exams

During the previous quarter, you passed clinical rotation at BU, In-Service exam, Written mock and oral mock board exams. For the In-Service exam scores, you show the largest improvement compared to your classmates.

     5. Board Case Presentation

To fulfill PEDO CAGS requirements, you are required to present Board Cases (Trauma, Restorative and Ortho). Please refer to our Program Manual for details and criteria for case selection and follow-up requirements. Date of the presentation is to be determined, but must be before January 31, 2020. I

strongly encourage you to start board cases very soon, in particular, ortho case due to limited clinic time and long-term follow up. Please work closely with Mike to increase your ortho clinic hours, select a case and begin treatment as soon as possible.

      6. Research Presentation

To fulfill PEDO CAGS requirements, you are required to present your research project. Please work closely with Dr. Shanmungham to fulfill this requirement prior to January 31, 2020.

That's it for now. Keep up the good work and check in with me on a bi-weekly basis. Please don't hesitate to reach out to me if you need anything.

Best wishes,
Dr. Porsche

56. Plaintiff continued to progress after completing the remediation program, into July 2019 and beyond. Porsche subsequently wrote to her colleagues about Plaintiff:

"Ken has come a really long way and has grown to be a trustworthy pediatric dentist. He has improved so much after the formal…"

(Dr. Porsche's July - September 2019 evaluation.)

57. Dr. Porsche's fellow faculty members agreed with her positive June 2019 evaluation. Dr. Magnolia Venegas stated in her April - June 2019 evaluation:

"He has developed a good diagnostic skill. He performs comprehensively and completes all his endeavors in a timely manner, and he is attentive to all instructions and recommendations. His English skills are coming along fine to be able to communicate with his little patients and parents as well his notes."

(Dr. Venegas' April - June 2019 evaluation.)

58. Another faculty member, Dr. Maria Al Ismail, wrote during the same period:

"Getting better this rotation in term of management and preparation."

20

(Al Ismail's April - June 2019 evaluation.)

59. From July through September 2019, along with her other colleagues, Dr. Porsche told Plaintiff on multiple occasions that Plaintiff had succeeded in meeting all of his requirements, including the one item that was mentioned as pending in the June 5, 2019, review. The "one item" missing as of June 5, 2019, was two cases of clinical treatment and practice cases. Those were completed by December 2019. By December 2019, the informal, potential "probationary" issues had been fully resolved.

60. Had the "remediation" efforts been unremarkable, defendants would have deemed their "deficiency/remediation" and "probation" status notice to be sufficient to expel plaintiff from School. Now that their plans had been effectively displaced, defendants needed another pretext to predicate their scheme.

### 6. 2020, The Scheme to Sabotage of Plaintiff's Clinical Presentation

61. With Plaintiff having completed the remediation program, the next item left was the last item left in a graduate dental student's clinical requirement: a give a case study analysis by verbal and visual presentation supported by evidence and facts. This is akin to some law schools' requirement of student participation in "moot court" and medical schools requiring similar patient/case presentation. It is, however, unlike a dissertation and generally the School's final case presentation is rendered by written materials before a verbal presentation and it is deemed satisfied based upon the materials compiled in the written version of the presentation. In other words, the "verbal presentation" is essentially perfunctory and is not the basis for grading the case presentation.

62. In December 2019, a month before Plaintiff's final Pediatric Clinical presentation date of January 28, 2020, his written presentation materials were provided to the review committee. At that time, based upon the "satisfactory" compilation of his written case presentation materials, the review committee members congratulated him on his expected graduation from the School. When the written presentation review was completed, as it was routinely the case, a "party" was held to mark the completion of Plaintiff's completion of his course of studies. In that December 2019 meeting, all of the School of Dentistry officers and colleagues of Plaintiff who attended his Pediatric Clinical presentation congratulated him on his successful completion. Dr. Porsche, too, praised Plaintiff to her colleagues.

63. Upon information and belief, defendants Sapir and Hutter were displeased that Plaintiff was about to graduate. On January 28, 2020, unaware that a secret, "Star Chamber" continued to operate behind his back to interfere with his efforts to graduate, Plaintiff used the case study materials from a month earlier, well received by the review committee members in December 2019, by verbally presenting it to the committee on January 28, 2020.

64. In reality, no graduate student is rumored to have failed due to an imperfect or deficient presentation; what counted was the written presentation materials. Stated differently, once a graduate student had come to that point, no one "failed" based upon "public speaking." Likewise, Plaintiff's one-on-one meetings with his instructors and his presentation given to the group sitting in evaluation of his presentation were both satisfactory and passing.

65. Yet, shortly after the January 28, 2020, Pediatric Clinical presentation, defendants'

conspiracy revealed itself. Dr. Porsche approached Plaintiff while he was alone and told him, point-blank, "you will fail this presentation." Plaintiff was shocked and dismayed and he requested an explanation, but Dr. Porsche commented only that he would be informed in "writing." "You will see."

66. Based upon the views and reactions of the review committee members and based upon the written presentation meeting in December 2019, there was no basis for failing Plaintiff. Plaintiff consulted the departmental Chairperson Dr. Zavras about his inexplicable exchange with Dr. Porsche and inquired why Dr. Porsche would utter such vile comments. Dr. Zavras stated that he would try to speak with Dr. Porsche to see if she would provide him with some insight. By February 2020, Plaintiff received no further information or word from Dr. Zavras or from the source, Dr. Porsche.

67. Instead, on February 25, 2020, defendant Dr. Porsche Jumlongras issued a lengthy letter stating that Plaintiff had not only "failed" the Pediatric Clinical presentation, but that he was being "dismissed" from the school, i.e., being "expelled" from the Graduate School of Dentistry, after three years of attendance and meeting all of the requirements, as they had confirmed.

68. As plaintiff came to understand later, upon information and belief, defendant Dr. Porsche Jumlongras's summary "dismissal" letter did not arise in a vacuum but had been the product of two years of hateful behind-the-scene attacks levied by defendants Cheney, Lo, Sapir, Hutter, Leone and Porsche who flip-flopped here and there but ultimately agreed to carry out the group's objective of preventing Plaintiff from graduating with a B.U. degree

because these members of the "Star Chamber" deemed him to be a "Korean male chauvinist" who was "unsuitable" for a B.U. degree.

69. Upon information and belief, internal emails and notes exchanged by the defendants will reveal that between December 2019 when Plaintiff rendered his written analysis of the case presentation, and January 2020 when he rendered it verbally, defendant Dean Hutter made the ultimate decision, along with the other defendants, to block Plaintiff's completion in the Program. When defendant Dean Hutter got wind that Plaintiff had effectively rendered the presentation, and would be eligible to graduate, internal machinations that began with defendants Dr. Cheney, Lo and Sapir and Deans Leone and Hutter reacted antagonistically among themselves and redirected the outcome. Upon information, defendants Leone and Hutter, in conjunction with other defendants, decided that Plaintiff "must not graduate." Defendants concocted their strategy; and the rejection of Plaintiff was to be delivered by defendant Dr. Porsche Jumlongras.

70. Defendant Porsche emailed Plaintiff her "dismissal" notice dated February 25, 2020. The "dismissal" letter violated B.U. policy and basic due process by expelling a student who had not been on any probation, with no notice or opportunity to address any concerns.

71. By B.U.'s own Bylaws and procedural rules, contained in the Post-doctoral Student Handbook, a student who suffers disciplinary action is said to have the "right to appeal" within 14 days. Plaintiff and his in-house counsel, Jihoon Plaintiff, requested a complete copy of all of Plaintiff's grades and submission materials relating to the Pediatric Clinical

presentation.  Initially, their requests were tendered to Dr. Porsche Jumlongras.  She delayed and/or passed off the responsibility of responding to Plaintiff's request for his submission materials to others; and eventually Plaintiff and his in-house counsel, Jihoon Plaintiff, tendered the request to B.U.'s Office of General Counsel.    Over the course of a week after the February 25, 2020, expulsion letter, defendants and B.U.'s Office of General Counsel provided drip-and-drab access to the materials sought by Plaintiff.  With an appeal deadline of 14 days from February 25, 2020, falling on March 11, 2020, defendants made it exceedingly difficult for Plaintiff to file an effective appeal that required the submission of "all relevant materials" together.

72. On March 9, 2020, Plaintiff's appeal package was submitted.  The first and most obvious fact presented in Plaintiff's appeal was that the grounds for expulsion were not only manufactured by the defendants and members of the "Star Chamber" but flagrantly in violation of the School's own Post-Doctoral Student Handbook.  The Handbook requires that the School follow three levels of academic discipline, with increasing degrees of severity for any student failing to "complete stated promotion guidelines in the clinic, classroom, or laboratory; and/or meet required standards of professional performance in any facet of the program…" An offending student is first placed on Academic Probation, which primary purpose is to provide reasonable, required notice in support of due process:

> The purpose of placing a student on academic probation is to provide an unambiguous warning that his/her academic achievement or behavior is not meeting the standards of his/her academic program.

By-Laws, Art. V, section 1.

73. Plaintiff's appeal statement further pointed out:

Students on academic probation are given a chance to remedy whatever deficiency that caused the student to be placed on probation. For a student who "has failed to heed the warning of being placed on academic probation," the School can place the student on Academic Suspension. According to the by-laws, a Dismissal, the most serious action the School can take, is reserved for students whose "academic performance, or lack of performance justifies dismissal." The applicable pages of the By-Laws have been attached hereto as Exhibit B. Under no objective standard did my performance at this school fall to this level.

The two more serious levels of sanction share the same common requirement. In the policies for Suspension and Dismissal, such actions "can be initiated at any time after 90 days from first probation." While the 90-day period can be changed, the by-laws still require that a student be first placed on academic probation prior to being suspended or dismissed. I have NEVER been placed on academic probation. The closest I came to probation was being placed on formal remediation status for not maintaining a satisfactory level of English proficiency and record keeping. In a letter to me dated January 29, 2019, Dr. Porsche notified me of my placement in remediation, and explained both the reason why I was placed in remediation and how I could successfully complete the remediation plan. This letter has been attached herein as Exhibit C.

Significantly, Dr. Porsche unequivocally stated that I was not being placed on academic probation. (See Exhibit C - "Please work toward meeting all of the above requirements. Failure to do so puts you at risk of being placed on Academic Probation status with the program. Academic Probation is a final warning and may lead to your dismissal from the program if the deficiencies still continue to be unresolved."). I have neither been placed on Probation prior to the January 29th letter, nor after the January 29th letter. Therefore, per the School's Due Process Procedures, the School did not follow its own rules by proceeding immediately towards expulsion without Academic Probation Status, or any notice at all. Accordingly, for this reason, I ask the Dean to reverse my dismissal from the CAGS program and allow me to graduate as I either completed or am very close to completing all school and CODA prerequisites for graduation. Any other result would amount to a significant injustice entirely inconsistent with the school's By-laws.

74. Using Plaintiff's prior dismissed, simple assault charge and "English difficulty" associated with a "heavy accent" is a racist way of discriminating him on a standard that no one else, among the many, many foreign born, instructors, professors, and students of B.U. are stricken in common with Plaintiff, and clearly was not a factor when defendant Dr. Porsche and others confirmed that Plaintiff had completed all of his requirements, before defendants huddled in secret with defendant Hutter and decided to change course, by issuing their demonstrably false and fraudulent expulsion letter of February 25, 2020.

75. Upon information and belief, defendant B.U., realizing that its officers and leadership in the Graduate School of Dentistry had "screwed up royally," is believed to have counseled defendant Hutter to vacate the expulsion, but rather than vacating the phony expulsion letter and permitting Plaintiff to graduate, defendant Hutter "doubled down" and attempted to fortify his violation and defendants' violation of the School's Rules stating that Plaintiff had been provided with "prior warnings" verbally.

76. Defendant Hutter's purported March 23, 2020, affirmance letter attempted to justify every portion of defendants' February 25, 2020, manufactured grounds, but ultimately admitted that Plaintiff had been provided with no written "notice" of possible expulsion; no prior written notice of probation; and no prior written academic warning of any kind that was in compliance with the Rules.  Despite the fact that written notices and warnings are required by the Rules, as sine qua non to any formal action such as suspension, probation or, worse, expulsion, defendant Hutter, for himself and the other defendants, insisted upon his phony grounds for expulsion as justified.

77. Curiously, even as defendant Hutter's March 23, 2020, letter sought to maintain "blame" upon Plaintiff, and incorporated by reference defendant Dr. Porsche's "February 20, 2020, letter," he failed to address her antecedent letter of June 2019 stating that Plaintiff had completed "6 out of 7" items and later the 7th; and failed to address the fact that everyone in the presentation deemed Plaintiff's presentation to be sufficient. Defendant Hutter disregarded the material facts, and added yet another impediment in Plaintiff's way:  If Plaintiff disagreed with his summary expulsion, he would now have to appeal, again within 14 days, to the School's Provost.

78. By then, defendant Hutter had added layers and layers of bureaucratic maneuvers to make it difficult for truth to surface. By this time, the School's Office of General Counsel was involved in this matter. Upon information and belief, BU's internal communications were, to the effect, that the summary expulsion, without written notice or warnings required by the Rules, were flatly "wrong" and "improper," not only at the time of the February 20, 2020, expulsion, but at the time of the March 23, 2020, affirmance letter, such that the March 23, 2020, such that the legal advice relating to the March 23, 2020, illegal "affirmance" will be sought in discovery.

79. The review process was not over until the Provost is involved so plaintiff obliged. On April 6, 2020, Plaintiff promptly filed an identical set of papers with the School Provost, as had been presented to defendant Hutter, for his second appeal.

80. Significantly, the Provost never issued a written decision. Instead, defendant School referred the violations of plaintiff's rights back to the defendants and defendants

decided that defendant Porsche would concoct a new letter that would change the expulsion to "probation" with "terms of probation."  Defendant Porsche's letter dated May 8, 2020, rescinding expulsion and applying a new, pretextual "probation" to support an eventual "expulsion" contained junk "terms and conditions" that were manufactured to fit the situation desired by the "Star Chamber."

### 7. May 2020 and Beyond, Defendants' Flip-Flop Game

81. Defendants' latest letter changing a graduate student's alleged "expulsion" to alleged "probation," with the simplistically of a child's changing telling of a story, was laughable as it made the Boston University Graduate School of Dentistry's high-level officials to be engaged in childish games.   But by having defendant Porsche issue the May 8, 2020, defendants confirmed that their pretextual "expulsion" letter of February 25, 2020, supported by their procedural maneuvers to stymie Plaintiff's appeals being filed "within 14 days" by depriving him of proper set of student records they could access immediately, in digital form, were all games being played by the members of the "Star Chamber."

82. From an objective, reasonable person's viewpoint, because defendants had already trumped up a fake "expulsion" and fake "probation" without clarifying their underlying, contradictory actions, their newly-concocted "probation" letter and grounds could not be trusted to be honored, and were not even appropriate because those "grounds" contradicted the parts of the Program that Plaintiff, according to defendant Porsche herself, had already been "completed" before December 2019, with praises from the review committee members.

83. As an institution of higher learning, defendant B.U. Graduate School of Dentistry

should want truth to prevail even if its agents would be humiliated and exposed, but defendant School has decided to insulate them, protect their illegal and unconstitutional actions, and ultimately to provide them with a cloak of legitimacy. Defendant School has failed and refused to overrule the fake "reviews"; has failed and refused to call the February 20, 2020, expulsion letter as wrongful; has failed and refused to call for Plaintiff to be graduated; and has actively suppressed the truth from seeing the "light of day."

84. During the appeal process, Plaintiff came to learn that the review committee that sat in "judgment" of his Pediatric Clinical presentation materials and the verbal presentation had been improperly constituted. The presentation review "committee" is required to include only Graduate School of Dentistry faculty who are licensed as dentists in the U.S.

85. Upon information and belief, one of the actual members of the review committee was a student who had finished the Pediatric Dentistry CAGS but was working on a PhD at Boston University Graduate School and not a professor. This student was a dentist licensed only in Saudi Arabia. This fact, if true, would rendered the review committee's actions void. Plaintiff's efforts to verify this matter was met with stonewalling by BU. By including a student in such committee, the committee chair violates the principle of autonomy of the "judge" (evaluator) as the student is dependent on the teacher for their future graduation. Yet, ironically, even this PhD student, had determined that Plaintiff's presentation was effective and that the presentation warranted a passing grade.

86. And even defendant Dr. Porsche Jumlongras deemed Plaintiff to have passed his presentation, but changed her grading after she conferred with defendants Leone and Hutter,

who, having been poisoned by defendants Cheney, Lo and Sapir, had directed defendant Dr. Porsche Jumlongras to trump up a fake "fail" grade.

87. Following the "fail" grade, defendant Leone convened the Graduate Studies Committee to hear Dr. Plaintiff's case from Interim Program Director Porshe Jumlongras. Under defendant Leone's directorship the committee decided to dismiss Plaintiff; this committee action violates the Student Handbook that requires that the student have the right to appear in front of the committee to defend himself against the program director's allegations. By not inviting Dr. Plaintiff to address the allegations, the committee illegally expedited the process of dismissal, thus violating the students rights under the Student Handbook.

88. Plaintiff also came to learn that, by February 2020, the scheme to black-list plaintiff, in retaliation for his personal behavior off the School campus, from three years earlier, was distressful and excessive to the Chairperson of the Program, Dr. Zavras,. Because Dr. Zavras perceived the defendants' treatment of Plaintiff was unfair, he tendered his resignation to Dean Hutter. Plaintiff expects that Zavras will disclose facts about his action and the subsequent denial of his resignation by Dean Hutter under compulsion of a subpoena.

89. Plaintiff also came to learn, after all of the multiple expulsion actions were taken by defendants without informing the Chairperson in advance, that, in a meeting coincident with defendant Porsche's February 25, 2020, expulsion letter, defendant Dean Hutter, told Porsche, in sum and substance, that "the School should never have admitted Plaintiff into the

program at all."  Upon information and belief, defendant Dean Hutter blamed Dr. Zavras for having enrolled a "bad person" into the Program and told her point blank: "I don't want any scandal.  Please  dismiss Plaintiff."

90. While defendants played their bureaucratic maneuver games behind their desks, for Plaintiff, a duly licensed dentist who practiced extensively in South Korea, and successfully practiced for 20-plus years, and his family, not only sacrificed considerable expenses to attending the three year Program but also incurred significant costs in the relocation of their family of four, including his wife and his two daughters, to Boston for four years, to pursue his dream of achieving his educational degree.  Tuition was approximately $80,000 per year and housing and related expenses were approximately $50,000 per year. Plaintiff also suspended his practice of dental management during this period and surrendered his operational responsibilities, and thereby incurred heavy business loss.  The aggregate value of Plaintiff's investment in his pursuit of the CAGS degree at BU amounted to well in excess of $450,000 in out  of pocket costs, and unmeasurable sums in business value and business opportunity delayed and derailed by defendants' bad faith actions.

91. It is in these ways that BU Graduate School of Dentistry permitted its upper echelon officers and leadership to manufacture their own, fake "Rules, and policies," and to apply fake, non-existent "standards" of academic evaluation that had no reference to reality or to the Student Rules or to any other formal structure against Plaintiff in violation of law. By perpetuating a false and fraudulent "basis" or "grounds" of dismissal unrelated to academic competence, and actively concealing the facts of their conduct, defendants have

never come clean and are continuing to hide the true, underlying scheme of their dishonest actions as academic leaders.

92. Due to defendants' acts and omissions, plaintiff has had to defer his professional practice and career in the United States by years longer than required by a natural progression of events, starting with his timely graduation from defendant Graduate School of Dentistry in 2021. This, in turn, has exponentially expanded plaintiff's financial injury from the ongoing inability to engage in the practice of dentistry.

93. Plaintiff's injury is ongoing. Even through the Provost's review, defendants have maintained their false and fraudulent "review" scheme and have lied to their Provost as well as to their Office of General Counsel, both of whom would otherwise have taken immediate action to restore plaintiff's proper academic standing. Indeed, plaintiff discovered and learned of defendants' essential scheme and related facts only in recent months through discussions with one or more former BU members.

## THE CLAIMS FOR RELIEF

### Count 1: Title IX Sex-based Discrimination by Boston University, as an Educational Institution Receiving Significant Federal Funding

94. The preceding allegations are incorporated here, by reference.

95. Title IX of the United States Code, 20 U.S.C. § 1681(a) provides, "(a) Prohibition against discrimination; exceptions. No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, . . . ."

96. Section 1681 prohibits discrimination "on the basis of sex" and this includes the actions of defendants and each of them using the pretext of plaintiff's "Korean male chauvinism" and actions relating to the municipal assault charge, despite the court's dismissal, as an unstated, basis to engage in their intentional, willful, malicious, and deliberate discrimination against plaintiff.

97. Plaintiff is among the protected class, and defendant have violated his rights under this law.  The actions of defendants and each of them directly and proximately caused plaintiff to suffer actual injury to his person, to his educational endeavors, and to his business interests.  Plaintiff is entitled to compensation as requested below.

### Count 2: Breach of Agreement by Defendant Boston University

98.  The foregoing paragraphs are incorporated by reference.

99.   Defendant School breached the express agreement with plaintiff and also breached the implied covenant of good faith and fair dealing by the acts, omissions, and breaches of the defendants and each of them.

### Count 3: Breach of Implied Covenant of Good Faith and Fair Dealing
### by Defendant Boston University

100.  The foregoing paragraphs are incorporated by reference.

101.  The covenant of good faith and fair dealing is implied in every contract and is implied in the purported contract(s) between plaintiff and defendant School.

### Count 4: Tortious Interference by Defendants Other than Boston University

102.  The foregoing paragraphs are incorporated by reference.

103.   In connection with a claim of tortious interference with contractual or advantageous business relations; a plaintiff must prove five elements: (1) that he and a third party had a contract or advantageous business relationship; (2) defendant(s) knew of the contract or relationship; (3) defendant(s) caused the contract to be breached or the relationship terminated or impaired; (4) the defendant did so by improper means or motive; and (5) the plaintiff was damaged or lost the benefit of the contract or relationship as a result. Skyhook Wireless, Inc. v. Google, Inc., No. 2010-3652, 2012 Mass. Super. LEXIS 280, 2012 WL 5309755, at *13 (Mass. Super. 2012) (Fabricant, J.), citing Draghetti v. Chmielewski, 416 Mass. 808, 816, 626 N.E.2d 862 (1994).

104. Plaintiff entered into a student-school agreement with defendant School. The non-School defendants were "third-parties" to this contract, and they knew the existence of the contract. Defendants and each of them interfered with, and caused, the contract to be terminated. Defendants and each of them did so by subterfuge, by concocting a sham "academic deficiency" which was wholly manufactured by them and each of them. Plaintiff was damaged by the loss of tuition; the loss of time and efforts spent in the School Program; and by the loss of business and loss of business opportunities.

**Count 5: Racial Discrimination in Violation of 42 U.S.C. 1981 - All Defendants**

105. The foregoing paragraphs are incorporated by reference.

106.   Title 42 of the United States Code § 1981 ("Equal rights under the law") prohibits race-based discrimination by private parties in the making and enforcement of contracts:

**(a) Statement of equal rights**

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**(b) "Make and enforce contracts" defined**

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

**(c) Protection against impairment**

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

107. Plaintiff is among, and is protected from, race-based discrimination by defendants, including, principally, the BU Graduate School of Dentistry.

108. Plaintiff had the right to make and enforce contracts, including the contract to enroll in the Graduate School of Dentistry; defendants and each of them intentionally, deliberately, and willfully impaired and interfered with plaintiff's contractual rights with defendant Graduate School of Dentistry.

109. As a result of those actions, defendants and each of them violated Section 1981.

WHEREFORE, plaintiff respectfully requests:

A. liability determination in plaintiff's favor and against the defendants, jointly and severally, on each of the claims presented in this action;

B. damages;

C. punitive damages;

D. shifting of legal fees, other professional fees, and costs incurred by plaintiff;

E. any other relief the Court deems just and proper.

## JURY TRIAL REQUEST

Pursuant to Rule 38 of the Federal Civil Rules plaintiff demands a trial by jury.

Dated April 26, 2024                    /s Matthew Kidd
                                        Matthew J. Kidd, Esq.
                                        Law Offices of Matthew J. Kidd
                                        12 Ericsson Street, Suite 201,
                                        Boston, MA 02122
                                        Tel 617-820-8400

                                        Michael S. Kimm, Esq. (*Pro hac vice* pending)
                                        KIMM LAW FIRM
                                        333 Sylvan Avenue, Suite 106
                                        Englewood Cliffs, NJ 07632
                                        Tel 917-477-8500