**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JEONG HOON KIM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SUSAN LO, CATALDO LEONE, | ) |
| TRUSTEES OF BOSTON UNIVERSITY | )  No. 1:24-cv-11134-JEK |
| a/k/a B.U. SCHOOL OF DENTISTRY | ) |
| a/k/a B.U. GRADUATE SCHOOL OF | ) |
| DENTISTRY, JEFFREY HUTTER, | ) |
| SHABTAI SAPIR, DOLRUDEE | ) |
| PORSCHE JUMLONGRAS, WENDY | ) |
| CHENEY, AND JANE DOES & JOHN | ) |
| DOES 1-10, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM AND ORDER ON THE MOTION TO DISMISS OF DEFENDANTS TRUSTEES OF BOSTON UNIVERSITY, DOLRUDEE PORSCHE JUMLONGRAS, SHABTAI SAPIR, AND CATALDO LEONE

Plaintiff Jeong Hoon Kim brings this action against Boston University's Graduate School of Dentistry ("BUGSD") and several associated faculty members and administrators, alleging that his February 25, 2020 dismissal from the school's postdoctoral degree program and the events leading up to that decision were motivated by discrimination on the basis of sex and race. He also contends that his expulsion was not conducted in accordance with the disciplinary procedures set forth in the school's Postdoctoral Student Handbook ("Handbook"). Defendants Trustees of Boston University, Dolrudee Porsche Jumlongras, Shabtai Sapir, and Cataldo Leone (the "BU Defendants") have moved to dismiss Kim's claims against them as time barred and for failure to state plausible claims for relief. Agreeing that Kim's claims are untimely, the Court will grant the

BU Defendants' motion. Because Kim's claims against the remaining unserved defendants are likewise time barred, the claims against those defendants will be dismissed as well.

## BACKGROUND

The Court recounts the facts based on the allegations in the complaint and "the content of documents . . . sufficiently referenced in the complaint." *Bazinet v. Beth Israel Lahey Health, Inc.*, 113 F.4th 9, 15 (1st Cir. 2024).

Kim is a licensed dentist in South Korea. ECF 1, ¶¶ 1, 17. In 2016, he enrolled in a three-year dual-degree program at BUGSD. *Id.* ¶ 2. The named individual defendants are all affiliated with defendant BUGSD. Defendant Jeffrey Hutter is the former Dean of BUGSD and is now Dean Emeritus. *Id.* ¶ 10. Defendant Cataldo Leone is the current Dean of BUGSD and was the Associate Dean for Academic Affairs during the relevant time period. *Id.* ¶ 9. Defendant Wendy Cheney is a Program Director and a Clinical Professor in the Department of Pediatric Dentistry at BUGSD. *Id.* ¶ 7. Defendant Susan Lo is a former Assistant Clinical Professor of Dentistry at BUGSD. *Id.* ¶ 8. Defendant Dolrudee Porsche Jumlongras is an Associate Clinical Professor of Dentistry at BUGSD and was the Interim Program Director for Kim's postgraduate degree program during the relevant time period. *Id.* ¶ 12. And defendant Shabtai Sapir is an Assistant Clinical Professor of Dentistry at BUGSD. *Id.* ¶¶ 11, 47.

Kim completed his one-year Master of Science in Dentistry degree at BUGSD in 2017 and then began working toward a two-year Certificate of Advanced Graduate Study ("CAGS") in Pediatric Dentistry. *Id.* ¶¶ 20-22. He was slated to begin the CAGS program on July 1, 2017. *Id.* ¶ 20. Following a background check, however, the Massachusetts Board of Registration in Dentistry refused to issue Kim a limited student license based on a pending charge against him for simple assault and battery in Boston Municipal Court. *Id.* ¶¶ 23, 26. Because Kim needed this

license to begin the clinical work required by the CAGS program, his start date in the clinical portion of that program was delayed for six months until January 2018, when the simple assault and battery charge was dismissed and Kim received his license. *Id.* ¶¶ 26, 29.

Kim alleges that once the defendants learned about the charge against him, they formed a conspiracy to oust him from BUGSD because they believed that he is a "'Korean, male chauvinist'" and should not be associated with the school. *Id.* ¶¶ 27-28, 31, 34, 39, 46. The "object of th[e] conspiracy," according to the complaint, was to prevent Kim from graduating from the CAGS program "by falsely rendering his clinical practice ability as 'incomplete.'" *Id.* ¶ 40. As evidence of this campaign against him, Kim claims that during his clinical rotation at Franciscan Children's Hospital, Cheney "harassed him routinely, and coerced [him] to use his 'free time' to clean the Franciscan Hospital facilities." *Id.* ¶ 31. Kim also alleges that Cheney secretly conferred with Leone, Jumlongras, Lo, and Hutter to carry out the conspiracy. *Id.* ¶¶ 31-32. Due to his conflict with Cheney, Kim was reassigned from his clinical rotation at Franciscan Children's Hospital to complete his clinical rotation at BUGSD's facilities. *Id.* ¶ 33. Kim further alleges that, on some unspecified date, Jumlongras told him that he was "'seen poorly'" as a "'Korean, male chauvinist [pig],' whose actions 'might hurt B.U.'" *Id.* ¶ 32 (brackets and quotation marks in the original).

Kim also alleges that Lo conspired with the other defendants to expel him from the dental clinic at the East Boston Community Health Center ("EBCHC"). *Id.* ¶ 34. He claims that this expulsion was based on a "personal grudge," but that the defendants "concocted a bunch of 'reasons' and schemed to tell [him] that he was essentially at sub-par performance and in need of 'remediation.'" *Id.* Kim additionally contends that on January 23, 2019, Jumlongras and Lo

schemed to deny his temporary dental license to prevent him from graduating. *Id.* ¶ 42. Also on that date, Cheney allegedly stated that Kim should not be permitted to graduate. *Id.* ¶ 41.

On January 29, 2019, Jumlongras sent Kim a letter notifying him that he was being placed on formal remediation status. *Id.* ¶ 44; ECF 16-1. The letter created a seven-part remediation plan and identified numerous performance deficiencies in Kim's clinical work at Franciscan Children's Hospital from September to December 2018. ECF 1, ¶¶ 44-45; ECF 16-1. In particular, the letter stated that "the most common complaints revolve around [Kim's] communication skills in English," including his "listening, verbal and writing skills." ECF 16-1, at 1 (emphasis omitted). The letter explained that "lacking the necessary skills to effectively communicate with your patients and their guardians creates a major obstacle for you to deliver optimal patient care." *Id.* at 2. The letter also described Kim's issues with record keeping, which included his frequent failure to "include vital information related to patient care" and his "unintelligible" and "incomprehensible" notes. *Id.* Other concerns included complaints that Kim was "'heavy-handed' with patients"; at times failed to complete required checks with faculty before initiating treatment procedures on patients; had failed one class and an exam in another class; and often did not follow infection control protocols, which resulted in cross-contamination. *Id.* at 2-3.

Kim alleges that the defendants' personal animus and racist view of his accent motivated this negative feedback. ECF 1, ¶¶ 45, 52. At the time, however, Kim states that he did not suspect ulterior motives behind the letter and worked hard to complete his remediation plan. *Id.* ¶¶ 53-54. Originally set to begin on January 1, 2019 and end on March 31, 2019, the remediation plan was later extended by three months to "allow [Kim] more time to overcome the identified deficiencies." ECF 16-3, at 1; *see* ECF 16-1, at 2. By June 2019, Kim had completed six of the seven

4

requirements. ECF 1, ¶ 55. Evaluations from the spring and summer of 2019 reflect his improvement during that period. *Id.* ¶¶ 56-58.

Kim alleges that he faced further harassment in his interactions with Sapir during his clinical rotation in the fall of 2019. Sapir allegedly "attacked [his] 'English ability'" when criticizing his communication with a patient, "made open accusations and threats to [Kim] in the presence of his co-residents," and "routinely ordered [Kim] to perform remedial, non-professional, non-academic tasks," such as cleaning up patient rooms and organizing supplies. *Id.* ¶¶ 48-50. Kim eventually requested and was granted a reassignment to complete his clinical sedation course at BUGSD's facilities. *Id.* ¶ 50. Kim alleges that Sapir retaliated by telling one or more of the defendants that Kim's professional relationship with Dr. Athanasios Zavras, the Pediatric Dentistry Department Chair, was "'unethical and improper'" and reporting it to Hutter and the school newspaper. *Id.* ¶ 51.

By December 2019, Kim had satisfied all seven requirements of his remediation plan. *Id.* ¶ 59. To graduate, Kim was required to give a Pediatric Clinical Case Presentation, which had written and oral components. *Id.* ¶¶ 61-62. Kim submitted his written materials in December 2019 and alleges that these materials were satisfactory. *Id.* ¶ 62. However, he failed his January 28, 2020 oral presentation. *Id.* ¶¶ 63, 67. Kim alleges that "no graduate student is rumored to have failed due to an imperfect or deficient presentation; what counted was the written presentation materials." *Id.* ¶ 64. Moreover, he claims that his performance was satisfactory and should have entitled him to pass. *Id.* But shortly after his presentation, Kim alleges, Jumlongras approached him and "told him, point-blank, 'you will fail this presentation.'" *Id.* ¶ 65.

On February 25, 2020, Jumlongras sent Kim a letter, copying Zavras and Leone, confirming that Kim had failed his Case Presentation and expelling him from the degree program.

*Id.* ¶ 67; ECF 16-3. The letter detailed "serious concerns" that had arisen over the course of his residency, including multiple failed rotations, several failed classes, and a clinic's decision to ban him from working at its site "due to concerns related to [Kim's] ability to practice pediatric dentistry." ECF 16-3, at 1. The letter noted that despite significant support from faculty, staff, and Kim's co-residents, Kim continued to struggle with his communication skills, sense of personal responsibility, attendance, and adherence to infection control protocols. *Id.* In addition, the letter stated that Kim had been barred from practicing on young children because of his "poor communication skills" and his "heavy-handedness with patients." *Id.* Finally, the letter reported that Kim's Case Presentation examiners had failed him unanimously and were "astounded" by Kim's poor performance at his presentation, including his misdiagnosis, improper treatment plans, failure to interpret radiographs, and inability to defend his orthodontic treatment plan. *Id.* at 2. The letter explained that on February 11, 2020, a committee had convened to review Kim's academic performance in the CAGS program and, after reviewing the many concerns about his competency, failed classes, and failure to complete two clinical rotations, unanimously agreed that dismissal from the program was warranted. *Id.*

Kim alleges that this expulsion arose out of a conspiracy between Hutter, Cheney, Lo, Sapir, Jumlongras, and Leone to prevent him from graduating, and he claims that the BUGSD leadership "manufacture[d] their own, fake 'Rules, and policies,' and . . . appl[ied] fake, non-existent 'standards' of academic evaluation that had no reference to reality." ECF 1, ¶¶ 68-69, 91. Kim alleges that when Hutter "got wind that [Kim] had effectively rendered the presentation, and would be eligible to graduate, internal machinations that began with defendants Dr. Cheney, Lo and Sapir and Deans Leone and Hutter reacted antagonistically among themselves and redirected the outcome." *Id.* ¶ 69. Kim also argues that the expulsion "violated B.U. policy and basic due

process by expelling a student who had not been on any probation, with no notice or opportunity to address any concerns," and that the Handbook entitled him to appear before the committee that decided on his expulsion. *Id.* ¶¶ 70, 87. He claims as well that one of the members of his presentation review committee was not a professor, which he asserts would have "rendered the review committee's actions void." *Id.* ¶¶ 84-85.

The expulsion letter gave Kim a fourteen-day window to appeal. *Id.* ¶ 71; ECF 16-3, at 2. He did so with the assistance of counsel on March 9, 2020, claiming that his expulsion was based on manufactured grounds and that it violated the procedures laid out in the Handbook. ECF 1, ¶ 72. According to Kim, the Handbook has three tiers of academic discipline, and a student must be placed on academic probation (which he was not) before being expelled. *Id.* ¶¶ 72-73.

Hutter affirmed the expulsion on March 23, 2020. *Id.* ¶ 76. On April 6, 2020, Kim appealed Hutter's decision to the provost. *Id.* ¶ 79. Kim did not receive a written decision from the provost. *Id.* ¶ 80. Instead, on May 8, 2020, Jumlongras sent him a letter rescinding his dismissal and reinstating him on probationary status. *Id.*; ECF 16-4. The terms of Kim's probation required him to retake and pass the Advanced Case Presentations in Pediatric Dentistry course; attend clinic; adhere to infection control protocols; demonstrate an ability to communicate effectively with patients, staff, faculty, and peers; keep accurate, clear, and timely records; improve his professional behavior, including by adhering to clinic protocols, checking his schedule, and requesting absences in advance; and meet with his probation supervisor on at least a monthly basis. ECF 16-4, at 1-2. In view of the hold on clinical activity then in place because of the COVID-19 pandemic, Kim was required to complete these tasks within two years of the resumption of clinical activity. *Id.* at 2. Kim alleges that trying to satisfy these requirements would have been futile because the probation was "pretextual" and the letter "contained junk 'terms and conditions' that were manufactured to

fit the situation desired by the" defendants' conspiracy. ECF 1, ¶ 80. He does not allege whether he attempted to fulfill his conditions of probation, nor does he allege any specific conduct from the defendants after the May 8, 2020 letter. Kim does allege, however, that he only discovered the defendants' conspiracy in "recent months through discussions with one or more former BU members." *Id.* ¶ 93.

Kim filed his complaint in this matter on April 26, 2024. ECF 1. Against the Trustees of Boston University, the complaint asserts claims for sex discrimination in violation of Title IX, 20 U.S.C. § 1681 *et seq.* (Count 1); breach of contract (Count 2); and breach of the implied covenant of good faith and fair dealing (Count 3). Against all defendants except the Trustees of Boston University, the complaint asserts tortious interference with Kim's contract with the school (Count 4). Against all defendants, the complaint asserts discrimination on the basis of race, in violation of 42 U.S.C. § 1981 (Count 5). Contending that Kim's claims are all time barred and otherwise fail to state plausible claims for relief, the BU Defendants moved to dismiss the claims against them under Federal Rule of Civil Procedure 12(b)(6). ECF 15. After a hearing, the Court took that motion under advisement. ECF 33.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must determine "'whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintif[f], the complaint states a claim for which relief can be granted.'" *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011)). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. The Court "may properly consider only facts and documents that are part of or incorporated into the complaint." *Rivera v. Centro Médico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009) (quotation marks omitted). Further, "when the pleader's allegations leave no doubt that an asserted claim is time-barred," granting "a motion to dismiss based on a limitations defense is entirely appropriate." *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir. 1998).

## DISCUSSION

### I.     Timeliness of Kim's Claims.

The BU Defendants first move to dismiss all of Kim's claims as time barred. The parties agree that the statute of limitations is three years for Kim's Title IX, breach of contract, breach of the implied covenant of good faith and fair dealing, and tortious interference claims, and four years for his Section 1981 claim. *See* ECF 16, at 6-8; ECF 26, at 11. They disagree, however, on when the clock for Kim's claims started to run and whether tolling or an equitable exception to the limitations periods is warranted. The BU Defendants contend that neither tolling nor any exception applies, and that Kim's claims accrued on February 25, 2020, the date he received notice of his dismissal from BUGSD, so all of his claims are time barred. Kim contends that under the discovery rule, the COVID-19 tolling order issued by the Massachusetts Supreme Judicial Court, and the continuing violation doctrine, his claims have not yet expired.

### A.     Limitations Periods.

Title IX does not codify its own limitations period, so in assessing the timeliness of Title IX claims, courts generally adopt the forum state's statute of limitations for personal injury actions. *Czerwienski v. Harvard Univ.*, 666 F. Supp. 3d 49, 77 (D. Mass. 2023); *see also Doe v. Brown*

*Univ.*, 43 F.4th 195, 205 n.6 (1st Cir. 2022) (noting that the First Circuit has not yet decided what statute of limitations governs Title IX claims but observing that district courts in the Circuit have applied the forum state's limitations period for personal injury claims). In Massachusetts, the limitations period for personal injury actions is three years. *Czerwienski*, 666 F. Supp. 3d at 77. Tort claims, like the tortious interference claim Kim asserts in Count 4, are likewise subject to a three-year limitations period. M.G.L. c. 260, § 2A. A Section 1981 claim, which Kim asserts in Count 5, expires four years after accrual. *See* 28 U.S.C. § 1658; *Buntin v. City of Boston*, 813 F.3d 401, 405 (1st Cir. 2015) (citing *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004)).

Contract claims generally have a six-year limitations period, M.G.L. c. 260, § 2, but contract claims alleging personal injuries have a three-year statute of limitations, *id.* § 2A. To determine which limitations period applies to a contract claim, a court must look to the "gravamen" of the claim. *Pagliuca v. City of Boston*, 35 Mass. App. Ct. 820, 823 (1994). "A claim is considered a contract claim when it is 'to recover from another money which in equity and good conscience he is not entitled to keep,' while a tort claim involves 'an accident resulting in injuries to person or property.'" *Quinn v. Hewlett-Packard Fin. Servs. Co.*, No. 18-cv-10705-LTS, 2018 WL 6107071, at *5 (D. Mass. Nov. 21, 2018) (quoting *Ansin v. River Oaks Furniture, Inc.*, 105 F.3d 745, 754-55 (1st Cir. 1997)). Kim does not specify the nature of his contract claim injuries in Counts 2 and 3 of his complaint, but he has not disputed, either in his brief opposing the motion to dismiss or at the hearing on that motion, the BU Defendants' characterization of his contract injuries as personal injuries subject to the three-year limitations period. *See* ECF 26, at 11 (Kim's brief representing that all of his claims are subject to either a three- or four-year statute of limitations). He has therefore waived argument on that point, and the Court accordingly concludes that Kim's contract claims, like his Title IX and tort claims, are subject to a three-year statute of

limitations. *See Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 19 (1st Cir. 2009) ("[I]ssues adverted to . . . in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned." (quotation marks omitted)).

    B.    <u>Claim Accrual, the Continuing Violation Doctrine, and Tolling.</u>

    The next question is when the clock on Kim's claims started to run. The timing of claim accrual depends on the claim alleged. Breach of contract actions accrue at the time a contract is breached. *See Saenger Organization Inc. v. Nationwide Ins. Licensing Assocs., Inc.*, 119 F.3d 55, 64 (1st Cir. 1997); *Berkshire Mut. Ins. Co. v. Burbank*, 422 Mass. 659, 661 (1996). Tort actions accrue at the time a plaintiff is injured. *See Joseph A. Fortin Constr., Inc. v. Massachusetts Hous. Fin. Agency*, 392 Mass. 440, 442 (1984). For discrimination claims under federal statutes like Title IX and Section 1981, "'[t]he proper focus is upon the time of the discriminatory acts.'" *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) (emphasis omitted) (quoting *Abramson v. Univ. of Hawaii*, 594 F.2d 202, 209 (9th Cir. 1979)).

    Applying these standards, Kim's claims all accrued on February 25, 2020, the date he received notice of his dismissal from BUGSD. Although Counts 2 and 3 of the complaint do not specify which contract the defendants allegedly breached, the complaint elsewhere references Kim's enrollment contract with BUGSD and the Handbook. ECF 1, ¶¶ 72, 104. Kim claims that his dismissal from the program constituted a breach of the Handbook's progressive academic discipline policies. *Id.* ¶¶ 72-73. Because accrual of contract claims occurs when a contract is allegedly breached, the clock on Kim's contract claims in Counts 2 and 3 started running on the day he was expelled from the CAGS program. Similarly, the injury asserted in Kim's tortious interference claim is his expulsion from BUGSD. He alleges that the defendants manufactured "a sham 'academic deficiency,'" which resulted in his injury: the termination of his "student-school

agreement" with BUGSD. *Id.* ¶ 104. Accordingly, the limitations period on that claim also started on February 25, 2020. Finally, Kim alleges in Counts 1 and 5 that the defendants' discrimination against him on the basis of sex and race interfered with his contract with BUGSD and otherwise injured him, in violation of Title IX and Section 1981. *Id.* ¶¶ 96-97, 108. His federal discrimination claims thus likewise accrued on the date of his dismissal, which, according to the complaint, marked the culmination of the defendants' alleged discriminatory scheme. *Id.* ¶ 65 (alleging that the "defendants' conspiracy revealed itself" after Kim's Case Presentation in January 2020, when Jumlongras told Kim that he would fail).

Kim disagrees, arguing that because the discovery rule applies, accrual did not begin on the date of his dismissal from the CAGS program. Under both the federal and state discovery rules, a plaintiff must have notice of the injury suffered and the identity of the person who caused that harm before a claim can accrue. *See Shervin v. Partners Healthcare Sys., Inc.*, 804 F.3d 23, 33 (1st Cir. 2015) (for federal and state discrimination claims, accrual occurs once a plaintiff experiences the "crystallized and tangible effect" of the discrimination and has "notice of both the act and its invidious etiology"); *Ouellette v. Beaupre*, 977 F.3d 127, 136 (1st Cir. 2020) (under the federal discovery rule, accrual only begins once a plaintiff "knows, or should know, . . . of both the fact of his or her injury and the injury's likely causal connection with the putative defendant"); *Harrington v. Costello*, 467 Mass. 720, 727 (2014) (under Massachusetts' discovery rule, "a cause of action accrues when the plaintiff discovers or with reasonable diligence should have discovered that (1) he has suffered harm; (2) his harm was caused by the conduct of another; and (3) the defendant is the person who caused that harm"). The limitations period commences when "an event or events have occurred that were reasonably likely to put the plaintiff on notice that someone may have caused her injury." *Bowen v. Eli Lilly & Co., Inc.*, 408 Mass. 204, 205-06 (1990)

(Massachusetts's common law discovery rule "prescribes as crucial the date when a plaintiff discovers, or any earlier date when she should reasonably have discovered, that she has been harmed or may have been harmed by the defendant's conduct"); *Ouellette*, 977 F.3d at 136 ("the federal discovery rule delays accrual until 'a reasonably prudent person similarly situated' to the plaintiff would discover . . . the existence of the injury and its probable cause" (citation omitted)).

The dismissal letter put Kim on notice that he had suffered a concrete injury. *See Shervin*, 804 F.3d at 33 (a doctor placed on probation "had notice almost immediately after being placed on probation that this disciplinary action was both tangible and concrete"). Kim also reasonably should have known that the defendants were responsible for his alleged harm. Jumlongras sent him the letter, copying Leone, on Boston University letterhead. ECF 16-3, at 1-2. Jumlongras was the Interim Program Director for Kim's degree and had previously communicated with Kim regarding the school's concerns about his performance. ECF 1, ¶¶ 12, 44, 55; ECF 16-1. Leone was the Associate Dean for Academic Affairs and supervised administration of the CAGS program while Kim was enrolled. ECF 1, ¶ 9. Kim further alleges that his dismissal decision was made "[u]nder defendant Leone's directorship." *Id.* ¶ 87. And Hutter was Dean of BUGSD at the time Kim was a student and allegedly "made the ultimate decision, along with the other defendants, to block [his] completion in the Program." *Id.* ¶¶ 10, 69. A reasonable person in Kim's position would have been on notice that Jumlongras, Leone, and Hutter, on behalf of BUGSD, were involved in the decision to dismiss him from the program.

Kim also should have known that Sapir, Cheney, and Lo contributed to this decision. The expulsion letter explained that the dismissal decision was based in part on complaints about Kim's clinical work, including critical feedback from faculty. ECF 16-3, at 1. Kim alleges that he was "'reassign[ed]'" from Franciscan Children's Hospital based on a conflict with Cheney, who at the

time was the Hospital's Clinical Director of the Pediatric Dental Clinic. ECF 1, ¶¶ 31, 33. Kim was also expelled from EBCHC's dental clinic, allegedly at the direction of Lo, who was at the time a faculty member at BUGSD and Clinical Director of EBCHC. *Id.* ¶ 34. And Sapir was an Assistant Professor of Clinical Dentistry during the relevant time period and had helped oversee Kim's work. *Id.* ¶¶ 47, 49 (Sapir "solely had the grading authority" over a portion of Kim's clinical program). Kim had also had several negative interactions with Sapir that led to Kim requesting reassignment to a different clinical instructor. *Id.* ¶ 50. Based on these interactions and the content of the dismissal letter, a reasonably prudent person in Kim's position should have known that the professors' evaluations of his work likely factored into his expulsion.

Kim nonetheless contends that the discovery rule should delay the date of claim accrual until he became suspicious in January 2024 that the defendants' dislike of him was motivated by discriminatory animus. That argument is inconsistent with the allegations in the complaint and with First Circuit precedent. As the complaint alleges, and as Kim's counsel conceded at the motion hearing, Jumlongras disclosed to Kim no later than the time of his expulsion that he "was seen as a 'Korean, male chauvinist [pig]' whose actions 'might hurt B.U.'" *Id.* ¶ 32 (brackets and quotation marks in the original); *see* ECF 34, at 23:4-25:14. The complaint further alleges that "shortly after the January 28, 2020, Pediatric Clinical presentation, defendants' conspiracy revealed itself." ECF 1, ¶ 65. Thus, the basis for Kim's allegations of a discriminatory conspiracy against him were known to him at the time of his dismissal. Furthermore, a plaintiff "need not know all the facts that support his claim in order for [the] countdown to commence." *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 749-50 (1st Cir. 1994) (rejecting the plaintiff's argument that his claim "existed in . . . a state of suspended animation until he became aware of the racial and political motives"). Once the plaintiff knows of the adverse action taken against him, the identity of the person or

persons responsible, and the stated reason for that action, the clock starts running on the limitations period. *Id.* The February 25, 2020 letter, together with Jumlongras' contemporaneous disclosures, put Kim on notice of the injury that undergirds each of his claims.

Nor is the Court persuaded by Kim's argument that the defendants' alleged fraudulent concealment of their scheme warrants tolling the limitations periods for his claims. The federal doctrine of fraudulent concealment may justify tolling a statute of limitations if "'(1) sufficient facts were [not] available to put a reasonable [person] in plaintiff['s] position on inquiry notice of the *possibility* of fraud, and (2) plaintif[f] exercised due diligence in attempting to uncover the factual basis underlying this alleged fraudulent conduct.'" *Salois v. Dime Sav. Bank of New York, FSB*, 128 F.3d 20, 25-26 (1st Cir. 1997) (quoting *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 128 (1st Cir. 1987)). Massachusetts' counterpart to this doctrine provides that limitations periods may be tolled "where 'the defendan[t] concealed the existence of a cause of action through some affirmative act done with intent to deceive,'" but not if the plaintiff has actual knowledge of the claim. *Magliacane v. City of Gardner*, 483 Mass. 842, 852 (2020) (quoting *White v. Peabody Constr. Co., Inc.*, 386 Mass. 121, 133 (1982)); *see* M.G.L. c. 260, § 12. Because Kim has conceded that he had actual knowledge that the grounds for his expulsion were "manufactured by the defendants" when he appealed his initial expulsion letter on March 9, 2020, ECF 1, ¶¶ 65, 72, his fraudulent concealment argument fails under both the federal and Massachusetts standards.

Kim next argues that his claims are not time barred because "the continuing denial of [his] right to graduate is an ongoing violation." ECF 26, at 9. Under the continuing violation doctrine, a plaintiff may recover for discriminatory conduct that would otherwise be time barred, so long as it is "part of an ongoing series of discriminatory acts and there is some violation within the statute of limitations period that anchors the earlier claims." *O'Rourke v. City of Providence*, 235 F.3d

713, 730 (1st Cir. 2001) (quotation marks omitted). The doctrine is limited "only to claims that cannot be said to occur on a particular day and that by their very nature require repeated conduct to establish an actionable claim, such as hostile work environment claims." *Ayala v. Shinseki*, 780 F.3d 52, 57 (1st Cir. 2015). The doctrine does not apply to "discrete acts" of alleged discrimination—such as "'termination, failure to promote, denial of transfer, or refusal to hire'"— which are "easily identifiable" and immediately actionable. *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)). Courts must "distinguish between a continuing violation and the continuing effects of a prior, yet discrete and no longer existent, discriminatory act." *DeNovellis v. Shalala*, 124 F.3d 298, 309 (1st Cir. 1997) (quotation marks omitted).

Kim's Title IX and Section 1981 claims are not saved by the continuing violation doctrine because his expulsion was a discrete act that resulted in an instantly actionable injury. *See Pérez-Sánchez v. Pub. Bldg. Auth.*, 531 F.3d 104, 107 (1st Cir. 2008). In his opposition to the motion to dismiss, Kim argues that the injury he has suffered is the "denial of graduation," not his expulsion, and that his injury is therefore "perpetual and ongoing." ECF 26, at 8 (emphasis omitted). But "[i]t is not enough to show that plaintiff is merely feeling the effects of some earlier discriminatory action." *Muniz-Cabrero v. Ruiz*, 23 F.3d 607, 610 (1st Cir. 1994); *Velazquez v. Chardon*, 736 F.2d 831, 833 (1st Cir. 1984). Moreover, Kim does not allege that the defendants continued a pattern of race- or sex-based discrimination in the years between his dismissal and the filing of his complaint, so he has not identified any act within the limitations periods that could anchor his otherwise expired claims.[1]

---

[1] Indeed, the complaint contains no concrete allegations that postdate the May 8, 2020 letter rescinding Kim's expulsion and placing him on probation. That letter gave Kim a pathway to graduate from the CAGS program. *See* ECF 16-4. Setting aside his vague and conclusory allegations about an ongoing conspiracy, Kim does not allege with specificity that the defendants impeded any efforts he might have made to satisfy the conditions of probation set forth in that

The continuing violation doctrine similarly does not apply to Kim's breach of contract and tortious interference claims. Because a breach of contract is a "single, readily ascertainable, event," courts have resisted applying the continuing violation doctrine to contract claims. *Quality Cleaning Prods. R.C., Inc. v. SCA Tissue N. Am., LLC*, 794 F.3d 200, 206 (1st Cir. 2015) ("We are not aware of any case in which a court . . . has applied the doctrine to a contract claim."). Similarly, Kim's tortious interference claim hinges on the alleged breach of Kim's enrollment contract at BUGSD, a discrete event, so it is likewise not subject to the doctrine. Nor does the allegation that BUGSD continued to violate a contract with Kim when it affirmed and then later rescinded his expulsion qualify as a continuing violation. *See id.* at 205 (a plaintiff cannot "'avoid filing suit so long as some person continues to violate his rights'" (quoting *Pérez-Sánchez*, 531 F.3d at 107)).

Finally, Kim contends that the Supreme Judicial Court's COVID-19 tolling order, which paused all civil statutes of limitations for 105 days, applies to his claims. *See Shaw's Supermarkets, Inc. v. Melendez*, 488 Mass. 338, 342 (2021). The order governed claims that apply state statutes of limitations, such as contract claims, tort claims, and Title IX claims, but not Section 1981 claims, which are subject to the federal limitations period set forth in 28 U.S.C. § 1658. *See Czerwienski*, 666 F. Supp. 3d at 78. Accordingly, Kim's Title IX, contract, and tort claims expired three years and 105 days after February 25, 2020—that is, in June 2023—and his Section 1981 claim expired in February 2024, four years after the point of accrual. Kim filed this lawsuit in April 2024. All of his claims are therefore time barred and must be dismissed.

---

letter. Thus, to the extent Kim contends that his injury is the denial of graduation, as distinct from his initial dismissal from the CAGS program, his complaint does not contain facts to support standing to assert that injury. *See Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 731 (1st Cir. 2016) (to establish standing to assert an injury, the complaint must plausibly allege an injury that is "concrete and particularized and actual or imminent, not conjectural or hypothetical" (quotation marks omitted)).

II.    **Remaining Matters.**

That conclusion leaves two outstanding matters. First, Kim seeks leave to amend his complaint in the event of a dismissal. Because Kim's claims are all time barred, and he makes nothing more than an unadorned request for leave to amend, devoid of any proposed additional factual allegations or claims, his request for leave to amend is futile and is therefore denied. *See Nikitine v. Wilmington Tr. Co.*, 715 F.3d 388, 390 (1st Cir. 2013) ("[A] district court may deny leave to amend when the request is characterized by 'undue delay, bad faith, futility, [or] the absence of due diligence on the movant's part.'" (quoting *Palmer v. Champion Mortg.*, 465 F.3d 24, 30 (1st Cir. 2006))); *Aponte-Torres v. Univ. of Puerto Rico*, 445 F.3d 50, 58 (1st Cir. 2006) (a plaintiff's "bare request for leave to amend," lacking a preview of "what additional facts or legal claims might be included" should amendment be allowed, "may, in and of itself, be a sufficient reason for the denial of leave to amend").

Second, the motion to dismiss was brought only by defendants Trustees of Boston University, Jumlongras, Sapir, and Leone. Defendants Cheney, Hutter, Lo, and Jane and John Does Nos. 1 through 10 have yet to be served. As to the unserved defendants, Kim is well past the 90-day period for service set by Federal Rule of Civil Procedure 4(m). When, as here, an "action is dismissed as to all defendants who have been served and only unserved defendants 'remain,' . . . there is no reason . . . to preclude the immediate and automatic entry of a final judgment since there is no basis for believing there will be any further adjudications in the action." *Leonhard v. United States*, 633 F.2d 599, 608 (2d Cir. 1980). Furthermore, where all claims against the served defendants are time barred, and where there are no different claims against the unserved defendants or factual allegations that could render the claims against those defendants timely, the presence of unserved defendants "does not defeat finality." *Manley v. City of Chicago*, 236 F.3d 392, 395 (7th

Cir. 2001); *accord Cooper v. Pickett*, 137 F.3d 616, 621-22 (9th Cir. 1997); *Ins. Co. of N. Am. v. Dealy*, 911 F.2d 1096, 1099 (5th Cir. 1990). Here, the conclusion that Kim's claims against the BU Defendants are time barred applies with equal force to the claims against Lo, Hutter, Cheney, and any Jane or John Doe defendants. Kim had the opportunity to address the timeliness of his claims in briefing and at the motion to dismiss hearing, and his complaint contains no distinct allegations against the unserved defendants that could render his claims against them timely. Accordingly, Kim's claims against the unserved defendants are also dismissed.

## CONCLUSION AND ORDER

For the foregoing reasons, the BU Defendants' motion to dismiss, ECF 15, is GRANTED, and Kim's claims are DISMISSED in their entirety.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
Dated: March 7, 2025                         UNITED STATES DISTRICT JUDGE